585 A.2d 1033

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Marshall Edwin LEET, Appellee.**

Superior Court of Pennsylvania.

Argued March 30, 1990.

Filed Jan. 23, 1991.

Bradley K. Hellein, Asst. Dist. Atty., Kittanning, for Com.

Joseph Caruso, Ford City, for appellee.

Blaine A. Lucas, Pittsburgh, amicus curiae.

Stephen F. Ritner, Philadelphia, amicus curiae.

Anthony C. Busillo, Harrisburg, amicus curiae.

Before CIRILLO, President Judge, and WIEAND, McEWEN, MONTEMURO, BECK, KELLY, JOHNSON, HUDOCK and FORD ELLIOTT, JJ.

WIEAND, Judge:

Does a deputy sheriff have authority in Pennsylvania to make warrantless arrests for Vehicle Code violations occurring in his or her presence? The trial court held that deputy sheriffs did not have such authority and suppressed contraband found in the motorist's vehicle following an

arrest by a deputy sheriff. The Commonwealth appealed. We affirm.

■ On May 17, 1988, while driving a marked sheriff's vehicle on Route 56 in Armstrong County, Deputy Sheriff Kevin Gibbons observed a vehicle, driven by Marshall Leet, cross double yellow lines and pass several vehicles stopped in a line of traffic. Gibbons shouted to Leet and instructed him to pull to the side of the road. When Gibbons thereafter approached Leet's car, he observed a can of beer on the front seat. Consequently, he asked Leet to exit the vehicle in order to perform a field sobriety test. Leet complied and successfully passed the test administered by Gibbons. When Leet returned to his vehicle, Gibbons asked to see Leet's driver's license, owner's card and insurance card. Leet was unable to produce a driver's license. Gibbons then initiated a call to determine the status of Leet's driving privileges and to summon police assistance. Leet's license, it was learned, was under suspension, and Officer Donald Weber arrived on the scene shortly thereafter to assist. When Gibbons entered Leet's car, with Leet's consent, to move it to a safer parking place, he observed a live "357 shell" on the floor and two paper bags behind the front seat. Subsequently, marijuana was found in one of the paper bags, and methamphetamine was found in the tape deck. Weber thereupon issued citations for driving with an expired license,[1] driving with an open can of beer in the car,[2] and passing in a no-passing zone.[3] Leet was also charged with unlawful possession of a controlled substance and possession with intent to deliver. Subsequently, Leet moved to suppress all physical evidence obtained by police following Deputy Sheriff Gibbons' allegedly unauthorized stop of Leet. The suppression court determined, after hearing, that Gibbons had lacked authority to stop Leet's vehicle for a traffic violation and suppressed the evidence.

1. 75 Pa.C.S. § 1501.
2. 75 Pa.C.S. § 3715.
3. 75 Pa.C.S. § 3307.

Although the sheriff has traditionally been the principal law enforcement officer of the county, this is no longer always true today; as communities grew local police departments were created resulting in a dichotomy between the daily functioning of police officers and sheriffs. In some states, the establishment of a police department resulted in an erosion of the office of sheriff. In others, when a local police force is established, the power and authority of the sheriff to enforce the law and preserve the peace is not legally diminished; both forces act cooperatively and in concert to achieve this desired purpose. 70 Am.Jur.2d *Sheriffs, Police, and Constables* § 3 (1987). In Pennsylvania, the Office of Sheriff is provided for by Article IX, Section 4 of the Constitution. The Constitution, however, does not define the duties of the sheriff. The Act of June 29, 1976, P.L. 475, 16 P.S. § 1216, amending the County Code, provides that sheriffs and deputy sheriffs "shall perform all those duties authorized or imposed on them by *statute.*" The Judicial Code, at 42 Pa.C.S. § 2921, in a section entitled, "powers and duties of the sheriff," provides that the "sheriff, either personally or by deputy, shall serve process and execute orders directed to him pursuant to law." There is nowhere to be found any statutory provision authorizing sheriffs or deputy sheriffs to stop vehicles and issue citations for motor vehicle violations.

■ "It is well settled that '[w]hen vesting a group with police powers and duties, the Legislature does so with specificity.'" *Allegheny County Deputy Sheriff's Association v. Pennsylvania Labor Relations Board*, 95 Pa. Commw. 132, 135, 504 A.2d 437, 439 (1986), quoting *Commonwealth v. Pennsylvania Labor Relations Board*, 64 Pa.Commw. 525, 532, 441 A.2d 470, 475 (1982). That the legislature intended to vest police, not sheriffs, with authority to enforce the provisions of the Vehicle Code is clear from the numerous provisions granting police powers to police officers without any corresponding authority to sheriffs or deputy sheriffs. The authority to arrest without

warrant for Vehicle Code violations has been vested in police officers by 75 Pa.C.S. § 6304 as follows:

(a) **Pennsylvania State Police.**—A member of the Pennsylvania State Police who is in uniform may arrest without a warrant any person who violates any provision of this title in the presence of the police officer making the arrest.

(b) **Other police officers.**—Any police officer who is in uniform may arrest without a warrant any nonresident who violates any provision of this title in the presence of the police officer in making the arrest.

(c) **Other powers preserved.**—The powers of arrest conferred by this section are in addition to any other powers of arrest conferred by law.

The corresponding duty on motorists to exhibit a vehicle registration and driver's license upon request exists only where a signal or request therefor is made by a "police officer." 75 Pa.C.S. § 6308(a).[4] Other provisions of the Vehicle Code which vest in police officers the authority to enforce traffic laws include the following: 75 Pa.C.S. § 3352 (authorizing police officers to remove stopped, standing, or parked vehicles); 75 Pa.C.S. § 3353 (authorizing police officers to make exceptions to parking prohibitions); 75 Pa.C.S. § 3368 (authorizing police officers to time rate of speed of any vehicle on any highway); 75 Pa.C.S. § 4729 (authorizing police officers to stop vehicles and remove certification of inspection); 75 Pa.C.S. § 4731 (authorizing police officers to inspect inspection stations and their records); 75 Pa.C.S. § 4981 (authorizing police officers to require driver of any vehicle to stop and submit vehicle to be measured and weighed); 75 Pa.C.S. § 6305 (procedure

4. The provisions of 75 Pa.C.S. § 6308(a) are as follows:

(a) **Duty of operator or pedestrian.**—The operator of any vehicle or any pedestrian reasonably believed to have violated any provision of this title shall stop upon request or signal of any police officer and shall, upon request, exhibit a registration card, driver's license and information relating to financial responsibility, or other means of identification if a pedestrian or driver of a pedalcycle, and shall write their name in the presence of the police officer if so required for the purpose of establishing identity.

which police officers follow in arresting non-resident); 75 Pa.C.S. § 6308(b) (authorizing police officers to stop vehicles for investigation); 75 Pa.C.S. § 6309 (authorizing police officers to impound vehicles for non-payment of fines); 75 Pa.C.S. § 6311 (duty of motorist to obey directives of police officer); 75 Pa.C.S. § 7105 (authorizing police officers to seize vehicles with removed or falsified vehicle identification numbers and to arrest person having possession); 75 Pa.C.S. § 7112 (persons falsely reporting to police officer theft or conversion of motor vehicle are guilty of misdemeanor); 75 Pa.C.S. § 7113 (police department has duty to report stolen and recovered vehicles to State police and owner upon recovery); 75 Pa.C.S. § 7123 (authorizing police officers to confiscate certificates or other documents issued by the department which are unlawfully possessed or used); 75 Pa.C.S. § 7310 (authorizing police officers to remove or direct removal of abandoned or wrecked vehicles and spilled cargo from any roadway).

There is no corresponding provision in the Vehicle Code, or in any other statute, which authorizes sheriffs or deputy sheriffs to arrest motorists without a warrant and request from such motorists their operator's license, vehicle registration, or insurance card.[5]

It is well settled that the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the legislature as expressed by the words employed. 1 Pa.C.S. § 1921(a); *Commonwealth v. Fisher*, 485 Pa. 8, 400 A.2d 1284 (1979); *Pennsylvania Human Relations Commission v. Alto–Reste Park Cemetery Ass'n.*, 453 Pa. 124, 306 A.2d 881 (1973); *Clearview Bowling Center, Inc. v. Hanover Borough*, 430 Pa. 579, 244 A.2d 20 (1968).

It is fundamental that in ascertaining the legislature's intent, the plain words of its laws may not be ignored.

---

**5.** Although the Vehicle Code vests several powers in the sheriff, including duties regarding impounded vehicles and, when authorized, to direct traffic, it does not at any place vest in sheriffs or deputy sheriffs the authority to make arrests for Vehicle Code violations. See: 75 Pa.C.S. §§ 3102, 6309, 6310.

*Stegmaier Estate,* 424 Pa. 4, 225 A.2d 566 (1967). A court may not alter, under the guise of interpretation, the express language and intent of the legislature. *Commonwealth v. Pope,* 455 Pa. 384, 317 A.2d 887 (1974); *see Zimmerman v. O'Bannon,* 497 Pa. 551, 442 A.2d 674 (1982). Thus, where the words of a statute are clear and free from ambiguity, a court may go no further to determine the legislative intent. *Kritz Estate,* 387 Pa. 223, 127 A.2d 720 (1956); *Rich v. Meadville Park Theatre Corp.,* 360 Pa. 338, 62 A.2d 1 (1948); *Commonwealth ex rel. Smith v. Clark,* 331 Pa. 405, 200 A. 41 (1938); *see* 1 Pa.C.S. § 1921(b), (c). It is only when the words of the statute are not explicit that the intention of the legislature may be ascertained by considering other means of statutory interpretation or construction. *Davis v. Sulcowe,* 416 Pa. 138, 205 A.2d 89 (1964); *Commonwealth v. Chester County Light and Power Co.,* 339 Pa. 97, 14 A.2d 314 (1940).

*Barasch v. Pennsylvania Public Utility Commission,* 516 Pa. 142, 155–156, 532 A.2d 325, 331–332 (1987), *aff'd,* 488 U.S. 299, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989).

The language of the statute in this case is explicit. Enforcement of the Vehicle Code has been vested by the legislature in police officers. Sheriffs and deputy sheriffs are not police officers. Cf. *Venneri v. County of Allegheny,* 12 Pa.Commw. 517, 316 A.2d 120 (1974). A deputy sheriff has not been authorized to stop a motorist and make an arrest for a Vehicle Code violation, whether or not the violation has been committed in the deputy sheriff's presence.

A review of the history of the Vehicle Code confirms this interpretation. Both section 1203 of the Motor Vehicle Code of May 1, 1929, P.L. 905, and section 1204 of the Motor Vehicle Code of April 29, 1959, P.L. 58, authorized *"peace officers,* when in uniform and displaying a badge or other sign of authority [to] arrest, upon view, any person violating any of the provisions of [the Motor Vehicle Code], where the offense [was] designated a felony or a misde-

meanor, or in cases causing or contributing to an accident resulting in injury or death to any person...." "Peace officers" were defined in section 102 of the Motor Vehicle Codes of 1929 and 1959 to include sheriffs, deputy sheriffs and constables. The Motor Vehicle Code of 1959, however, contained, in section 1201(c), the following limitation pertaining to arrests for summary offenses:

(c) Any salaried police officer, excluding any person compensated solely or in part by fees, who shall be a member of a police department organized and operating under the authority of cities of the first, second and third class, or a borough, incorporated town or township of the first class, when in uniform and exhibiting his badge or other sign of authority, whenever a summary offense as described in this act is committed in his presence, shall be vested with the authority to stop and present to the alleged offender a printed notice to appear before the nearest available magistrate or in cities of the first class or cities of the second class, any magistrate sitting in the central traffic court.

This intent was carried over into the present Vehicle Code. At 75 Pa.C.S. § 6308, the legislature authorized "police officers" to stop vehicles for any violations of the Vehicle Code.

The Commonwealth would nevertheless have us revert to the common law to find general peacekeeping duties in the sheriff. Based on authority vested in sheriffs and deputy sheriffs by the common law, the Commonwealth argues that sheriffs and deputy sheriffs have inherent power and authority to arrest without a warrant for all crimes, however defined, committed in their presence, including Vehicle Code violations. We are unable to accept this reasoning. In the first place, an attempt to imply power where the same has not been granted by statute would be in direct violation of the legislature's mandate that sheriffs and deputy sheriffs shall perform the duties imposed by statute.

■ Moreover, although "the sheriff's power at early common law was indeed formidable, [ ] it is not tenable to

carry over such a broad base of authority in the present [day]." *Venneri v. County of Allegheny, supra* at 523 n. 2, 316 A.2d at 124 n. 2. The encroachment of other institutions, including the expertise and technology of modern law enforcement agencies, has greatly diminished the authority of the office of sheriff. Today, the sheriff's principal function is as an arm of the court, which is the duty specifically assigned to the office of sheriff by the legislature.

■ Finally, common law crimes have been abolished in Pennsylvania. "No conduct constitutes a crime unless it is a crime under this title or another statute of this Commonwealth." 18 Pa.C.S. § 107(b). The crime for which Leet was stopped was made an offense by the Vehicle Code. The legislature has vested the authority and the duty to arrest for violations thereof in police officers. To expand the authority of sheriffs and deputy sheriffs by implication to make such arrests is to violate the tenet that when the legislature intends to vest a group with police powers it will do so with specificity. *Allegheny County Deputy Sheriff's Association v. Pennsylvania Labor Relations Board, supra.*

As has been argued by Amicus, "[t]here is a comprehensive regulatory scheme governing police training, arms certification and other areas which are vital to [the] critical public service [of enforcing the Vehicle Code]. The same regulations are generally not applicable to sheriffs' employes. While no one can doubt the importance of the office of sheriff and the vital role it plays [in] the functioning of the court[s], these officials are not police [officers] by legislative design...." Whether sheriffs and deputy sheriffs continue to have general peace keeping duties is not now before this Court, and with respect thereto we express no opinion. It is quite clear, however, that they have not been entrusted with authority to enforce the Vehicle Code.[6]

6. We do not restrict the powers of the sheriff except as herein set forth. We hold only that sheriffs and deputy sheriffs do not have

This duty has been vested in "police officers" by the people of the Commonwealth, acting through their legislative representatives.

██ When Deputy Sheriff Gibbons stopped Marshall Leet for an alleged violation of the Vehicle Code, he was acting in his capacity as "deputy sheriff" and not as a "private citizen." His conduct, therefore, implicated "state action." See and compare: *Commonwealth v. Eschelman*, 477 Pa. 93, 383 A.2d 838 (1978). Because Gibbons did not have authority to arrest Leet for an alleged violation of the Vehicle Code, suppression of evidence seized as a result of his unlawful arrest was an appropriate remedy. To hold otherwise would be to vest in deputy sheriffs by indirection the right to effect warrantless arrests for Motor Vehicle Code violations by holding motorists at gunpoint or otherwise until a "police officer" arrives on the scene to make a lawful arrest. Because the trial court properly suppressed the contraband seized following Leet's unlawful arrest by a deputy sheriff, its order will be affirmed.

Order affirmed.

MONTEMURO, J., files a concurring and dissenting opinion.

CIRILLO, President Judge, files a dissenting opinion joined by FORD ELLIOTT, J.

KELLY, J., did not participate in the consideration or decision of this case.

MONTEMURO, Judge, concurring and dissenting:

While I am in total agreement with the majority's disposition of this case as to the sheriff's authority to arrest, and join to that extent, I would respectfully point out that the proper remedy may not necessarily be suppression of evidence seized as a result of the unlawful arrest. I believe that, instead, the Supreme Court's holdings in *Common-*

authority under Pennsylvania law to make warrantless arrests for violations of the Vehicle Code.

*wealth v. Corley,* 507 Pa. 540, 491 A.2d 829 (1985), and *Commonwealth v. Mason,* 507 Pa. 396, 490 A.2d 421 (1985), control. In *Corley,* appellant was detained for various offenses which had occurred outside the presence of a security guard, who, in the course of arresting appellant removed from appellant's person a wallet stolen from the victim. The conviction was followed by an appeal premised on the claim that counsel had been effective for withdrawing a meritorious suppression motion related to the wallet. It was argued that the exclusionary rule applied to a citizen's arrest, and that no private citizen could arrest absent the commission of a felony in his presence.

The Superior Court affirmed, holding that although the exclusionary rule theoretically applied in instances of citizen's arrest, the arrest under consideration was legal, and the rule therefore remained dormant. The rationale advanced was that because the state became involved after effectuation of a citizen's arrest, that is, ratified the arrest, the arresting person's conduct became chargeable to the state, and the results of that conduct became liable to suppression. The court further reasoned that despite dicta to the contrary, a citizen could arrest for breaches of the peace he had personally observed, merely by extension of the common law rule permitting such arrests after the occurrence and observation of a felony, thus lending legitimacy to the arrest in question, and insulating it from application of the exclusionary rule.

On further appeal, the supreme court, while affirming, found this court to have misapprehended the concept of state action. It distinguished between the situation in which the state bears responsibility for the results of actions performed by a private person specifically in the capacity of an instrument or agent of the state, and the situation in which the state merely uses the results of that individual's actions. The former is subject to application of the exclusionary rule since the conduct involved is not subject to criminal or civil liability, having been caused by the exercise of some state right or privilege. Suppression

is therefore the penalty to be paid by the state for the improper conduct of someone acting on its behalf. Where the conduct of the arresting person is not chargeable to the state, mere cooperation with state officials is not sufficient to activate the exclusionary rule. Applying this concept to the instant case, since the sheriff could not, given the limitations inherent in his position, have operated under color of law, concomitantly, the arrest herein could not have been performed by him as an instrument or agent of the state, and does not compel application of the exclusionary rule.

Although the majority argues that the sheriff as a constitutional officer cannot be covered by the rubric "private citizen," he has no more power to arrest under the circumstances of this case than does such a citizen. If he does not have the authority to act on behalf of the state, his conduct cannot, by definition, be posited as state action. Therefore, state action is not implicated by Gibbons' "acting in his capacity as deputy sheriff" (majority Opinion at 1038), since that office never provided him with the capacity to arrest for summary offenses.

In *Commonwealth v. Eschelman*, 477 Pa. 93, 383 A.2d 838 (1978), our supreme court found an arrest made by off-duty auxiliary policeman to have been "ratified" by the state, where the searcher was acting as a policeman, and was treated by other officers as such. These acts of ratification followed naturally upon the authority of the officer to arrest which would have been operative otherwise than during his off-duty hours. In other situations where the power to arrest exists but has been limited by factors such as jurisdictional boundaries, *see, Commonwealth v. Mason, supra,* the rule of exclusion is not automatically applied to provide redress from "real or imagined transgressions of a defendant's right to be free from unreasonable searches and seizures." *Corley, supra* 507 Pa. at 552, 491 A.2d at 834. In *Mason,* our supreme court declined to apply the exclusionary rule to the fruits of a search conducted in apparent violation of Pa.R.Crim.P. 2004, which

states merely that warrants of search shall be served "by a law enforcement officer." The search was conducted by officers who had no jurisdiction at the location of the search, accompanied by local police who did not participate in the search. The presence of the latter was found to fulfill the jurisdictional necessity established by the rule. Citing *Commonwealth v. Musi*, 486 Pa. 102, 404 A.2d 378 (1979), the court stated,

> A rule of exclusion is properly employed where the objection goes to the question of the reliability of the challenged evidence ... or reflects intolerable government conduct which is widespread and cannot otherwise be checked.

*Id.*, 486 Pa. at 115, 404 A.2d at 383.

As the concurrence in *Corley* points out, the Supreme Courts of the United States and of the Commonwealth of Pennsylvania have made clear that "the exclusionary rule will not be extended to areas where its application would not tend to achieve its primary purpose of deterring unlawful police conduct." *Id.* 507 Pa. at 552, 491 A.2d at 835 (emphasis in original). "It is only where the violation also implicates fundamental, constitutional concerns, is conducted in bad faith or has substantially prejudiced the defendant that exclusion may be an appropriate remedy." *Mason* at 407, 490 A.2d at 426 (emphasis in original). Since it has been concluded that a deputy sheriff is not a police officer regardless of his having erroneously attempted to act as one, none of the conditions specified in *Mason* is present, and no other factor exists which compels suppression of the evidence as a remedy.[1]

---

1. The majority states that suppression is the appropriate remedy because otherwise deputy sheriffs would merely be given by indirection carte blanche to "hold[ ] motorists at gunpoint or otherwise" until a "valid" arrest could be effected. I would suggest that criminal charges of kidnapping, false imprisonment, aggravated assault, and possible criminal conspiracy, or tort actions for false arrest, false imprisonment, assault and battery, etc., which would inevitably follow upon such a scenario would tend to discourage its repetition. The main point of the exclusionary rule is to punish the state, which is otherwise immune from liability for an actionable detention. However, where a person without "a privilege defined by the law of the

Finally, the dissent also found that a deputy sheriff is not empowered to arrest for summary offenses. This court has held that the right of a private citizen to arrest does not include summary violations. *See, Commonwealth v. Stahl,* 296 Pa.Super. 507, 442 A.2d 1166 (1982). This parallel further extends the notion that evidence obtained as the fruits of the arrest herein not be suppressed.

Accordingly, I would find that the arrest was illegal, but would decline to suppress its fruits.

CIRILLO, President Judge, dissenting:

Because I am firmly convinced that a sheriff and his or her deputies are vested by the Pennsylvania constitution with all the powers and duties of a peace officer, including the authority to arrest for a summary traffic violation committed in his or her presence, I would reverse the trial court's order suppressing the evidence obtained from Leet as a result of the roadside stop conducted by Deputy Sheriff Gibbons. This conclusion is based upon a careful study of the history of the powers and duties of the sheriff and his traditional role in the enforcement of our criminal laws.[1]

The word sheriff evolved from the Saxon word "scyre" meaning shire or county, and the word "reve" meaning guardian or keeper. *The Compact Edition of the Oxford English Dictionary,* Volume II, 2783–2784 (1971); A.E. Gwynne, *Practical Treatise on the Law of Sheriff and*

state" *Commonwealth v. Corley,* 507 Pa. at 548, 491 A.2d at 832, engages in behavior such as that described, he is not shielded from the civil or criminal repercussions of his acts. *Id.* The majority definitively deprives deputy sheriffs of the privilege to arrest for summaries. They may not contravene that decision with impunity.

1. Although it is unclear whether Deputy Sheriff Gibbons actually arrested Leet, intuitively, the power to stop without a warrant is a logical corollary to the power to arrest without a warrant. If an officer has the authority to make a warrantless arrest, it is unreasonable to require that he get a warrant to make the stop that precedes the arrest. Consequently, this analysis focuses on the sheriff's authority to arrest, and the factual issue of whether Deputy Sheriff Gibbons made an actual arrest, as opposed to an investigatory stop, is immaterial to this analysis.

*Coroner, with Forms and References* at 2 (1849) (hereinafter Gwynne, *Sheriff and Coroner*). Instinctively, when we think of a sheriff, we are reminded of Sherwood Forest where the Sheriff of Nottingham was the chief law enforcement officer who possessed far reaching powers. *See* H. Pyle, *The Merry Adventures of Robin Hood* (1883) (King Henry of England stated to the Sheriff of Nottingham: "[b]ut look well to it, master Sheriff, for I will have my laws obeyed by all men within my kingdom, and if thou art not able to enforce them, thou art no sheriff for me"). The modern sheriff's powers and duties, however, are not as clearly defined.

In Pennsylvania, the office of sheriff is constitutionally created: "[c]ounty officers shall consist of ... sheriffs...." Pa. Const. art. IX, § 4. While our constitution created the sheriff's office, it did not define his powers.[2]

**2.** The Commonwealth Court has acknowledged that neither our constitution nor our statutes enumerate the sheriff's powers and duties.

Quite candidly ... we are somewhat dismayed by our research disclosure that the Legislature has never chosen to enact legislation delineating the general powers, duties, and responsibilities of the sheriff.

*Venneri v. County of Allegheny,* 12 Pa.Commw. 517, 529, 316 A.2d 120, 126 (1974).

Most jurisdictions have statutorily defined the duties of a sheriff. Moreover, the majority of those statutes have expressly granted sheriffs the authority to arrest without a warrant. *See, e.g.,* Arizona, (Ariz.Rev.Stat.Ann. §§ 1–215(23), 11–441(A)(2), and 13–3883 (1989)); California, (Cal.Penal Code §§ 830.1 and 836 (West 1985 & Supp. 1990)); Colorado, (Colo.Rev.Stat.Ann. §§ 16–3–102 and 18–1–901 (West 1990)); Connecticut, (Conn.Gen.Stat.Ann. §§ 54–1f and 53a–3(9) (1985 & Supp.1990)); Hawaii, (Haw.Rev.Stat. § 601–33 (1985 & Supp.1989)); Illinois, (Ill.Stat.Ann. ch. 125, para. 17 (Smith–Hurd 1967 & Supp.1989)); Indiana, (Ind.Code Ann. § 36–2–13–5 (Burns 1981 & Supp.1989)); Iowa, (Iowa Code §§ 801.4(7)(a) and 804.7 (1979 & Supp.1990)); Kentucky, (Ky.Rev.Stat. §§ 446.010(24) and 431.005 (1985 & Supp.1988)); Maine, (Me.Rev.Stat.Ann. tit. 15 § 704 (1980)); Maryland, (Md.Ann.Code art. 27, §§ 594B(a) and 594B(g)(9) (1988 & Supp.1989)); Missouri, (Mo.Ann.Stat. § 544.216 (Vernon 1987)); Nevada, (Nev.Rev.Stat. §§ 169.125(2) and 171.124 (1987)); New Hampshire (N.H.Rev.Stat.Ann. §§ 594:10 and 594:1(III) (1986 & Supp. 1989)); New Jersey, (N.J.Rev.Stat. § 2A:157–2.1 (1985)); New York, (N.Y.Crim.Proc.Law §§ 1.20(34)(b), 140.10, 140.25 and 2.10(2) (McKinney 1981 & Supp.1990)); North Dakota, (N.D.Cent.Code §§ 29–05–10 and 29–06–02 (1974 & Supp.1989)); Ohio, (Ohio Rev.

There are, however, two statutory sections which address

Code Ann. § 2935.03(A) (1975 & Supp.1989)); Oklahoma, (Okla.Stat. Ann. tit. 22, § 196 (1969 & Supp.1990), Okla.Stat.Ann. tit. 21, § 99 (1983)); South Carolina (S.C.Code Ann. § 23-13-60 (Law.Co-op. 1977)); South Dakota, (S.D.Codified Laws Ann. § 7-12-1 (1981), S.D. Codified Laws Ann. §§ 23A-3-2 and 23A-45-9(9) (1988)); Texas, (Tex. Code Crim.Proc.Ann. arts. 2.12 and 2.13 (Vernon 1977 & Supp.1990)); Utah, (Utah Code Ann. §§ 77-1a-1(1)(a)(i) and 77-7-2 (1990), Utah Code Ann. § 17-22-2(1)(b) (1987 & Supp.1989)); Vermont, (Vt.R. Crim.P. 3(a) and 54(c)(6)); Virginia, (Va.Code Ann. § 19.2-81 (1983 & Supp.1989)); West Virginia (W.Va.Code § 62-10-9 (1989)); Wisconsin, (Wis.Stat.Ann. §§ 967.02(5) and 968.07(1)(d) (West 1985), Wis. Stat.Ann. § 59.24 (West 1988)); Wyoming, (Wyo.Stat.Ann. §§ 7-2-101(a)(iv)(A) and 7-2-103 (1987).

Several other jurisdictions, while not granting express authority to make warrantless arrests, have interpreted their arrest statutes as allowing sheriffs to make such arrests. *See, e.g.,* Florida, (Fl.Stat.Ann. §§ 30.07 and 30.15 (West 1988), Fl.Stat.Ann. § 901.15 (West 1985 & Supp.1990), *Fields v. State,* 160 Fla. 877, 878, 36 So.2d 919, 920 (1948) (court justified a deputy sheriff's warrantless arrest by stating that "[t]he law of [Florida] by statute makes the sheriff and the deputy sheriff officers to conserve the peace and authorizes them to make arrests"), 72 Fl. Att'y Gen.Op. 381 (1972)); Louisiana, (La.Code Crim. Proc.Ann. art. 213 (West 1967 & Supp.1990), *Castriotta v. Cronvich,* 277 So.2d 744, 746 (La.Ct.App.1973) (warrantless arrest for a misdemeanor committed in the presence of the deputy sheriff was "authorized by virtue of Article 213 of the Code of Criminal Procedure")); Michigan, (Mich.Comp.Laws § 764.15 (1982 & Supp.1990), *People v. Robinson,* 344 Mich. 353, 364, 74 N.W.2d 41, 42 (1955) ("[a]uthority of a deputy sheriff of the county to arrest or stop defendant for a misdemeanor committed in the officer's presence cannot be questioned")); Minnesota, (Minn.Stat.Ann. § 387.03 (West 1968), Minn. Stat.Ann. §§ 626.84 and 629.34 (West 1983 & Supp.1990), *Bielejeski v. Commissioner of Public Safety,* 351 N.W.2d 664, 666 (Minn.Ct.App. 1984) (deputy sheriff, who was also a policeman, effectuated a warrantless arrest outside of the police's jurisdiction but the court held that "the officer had the power to arrest as a Crow Wing County Sheriff")); North Carolina, (N.C.Gen.Stat. § 15A-401(b) (1988) *State v. Gray,* 55 N.C.App. 568, 286 S.E.2d 357 (1982) (warrantless arrest by a deputy sheriff was valid under N.C.Gen.Stat. § 15A-401(b)).

Many other state statutes authorize the sheriff to arrest criminals as part of his duties without indicating whether the sheriff may make warrantless arrests for all crimes committed in the sheriff's presence. *See, e.g.,* Alabama, (Ala.Code § 36-22-3(4) (1977); Arkansas, (Ark. Stat.Ann. § 14-15-503(b) (1987)); Idaho, (Idaho Code § 31-2202(2) (1983 & Supp.1989)); Massachusetts (Mass.Gen.L. ch. 37 § 11 (1985) and ch. 276 § 28 (1972 & Supp.1990); Mississippi, (Miss.Code Ann. § 99-3-1 (1973 & Supp.1989)); Montana, (Mont.Code Ann. § 7-32-2121(2) (1989)); Nebraska (Neb.Rev.Stat. § 23-1710 (1987)); Oregon, (Or.Rev.Stat. § 206.010(1) (1989)); Tennessee, (Tenn.Code Ann. § 8-8-213 (1988)); Washington, (Wash.Rev.Code Ann. § 36.28.010 (West 1964 & Supp.1990)).

the modern sheriff's powers and duties. The majority, like the suppression court, concludes that these statutes delimit the sheriff's authority. This interpretation has the effect of stripping the constitutional office of the sheriff of any powers not enumerated by the legislature, removing the sheriff from his traditional position as the primary law enforcement officer of the county, and relegating him to a secondary role with duties consisting primarily of serving process and enforcing specific directives of our courts. I cannot agree that the legislature intended, or could constitutionally attempt to achieve, such a result.

Sheriffs and deputy sheriffs, in their capacity as peace officers, "shall perform all those duties authorized or imposed on them by statute." 16 P.S. § 1216. Section 1216, which took effect in 1976, was an unnamed act intended to clarify the powers of sheriffs and deputy sheriffs. *See* Act of June 29, 1976, P.L. 475, No. 121 § 1. The act clearly contemplates legislative action to define those duties further. It does not, however, abolish the common-law duties of the sheriff. That it was not intended to do so was made clear later that same year, when the legislature enacted the Judiciary Act of 1976 amending Title 42 of the Pennsylvania Consolidated Statutes. In section 27(a) of the Judiciary Act, the legislature carefully articulated how the Title 42 amendments would affect certain officers:

> [N]either this act nor any provision of Title 42 (relating to judiciary and judicial procedure) as added by this act shall impair or limit the existing rights, powers, functions or immunities of any district attorney, *sheriff,* register of wills, prothonotary of any county except the City and County of Philadelphia, clerk of the courts, Clerk of Quarter Sessions of the City and County of Philadelphia, clerk of the orphans' court division or coroner.

Act of July 9, 1976, P.L. 586, No. 142 § 27(a) (emphasis added). Section 27(a) unmistakably emphasizes the legislature's intent that sheriffs retain the powers they already possessed.

In 1978, the powers and duties of sheriffs were further delineated in the Judiciary Act Repealer Act ("JARA"): "[t]he sheriff, either personally or by deputy, shall serve process and execute orders directed to him pursuant to law." Act of April 28, 1978, P.L. 202, No. 53 § 10(27) (codified at 42 Pa.C.S. § 2921) (hereinafter JARA 10(27)). JARA also repealed section 27 of the Judiciary Act of 1976 "insofar as inconsistent with the Judiciary Act Repealer Act." Act of April 28, 1978, P.L. 202, No. 53 § 2(a) (codified at 42 Pa.C.S. § 20002(a) (1474)) (hereinafter JARA 2(a)). Finding this general repeal insufficient to accomplish the goal sought, the legislature, in the Judiciary Act Repealer Act Continuation Act, subsequently repealed the specific portion of section 27(a) of the Judiciary Act which dealt with the powers of the Prothonotary, Clerk of Courts, Clerk of the Quarter Sessions and the Clerk of the Orphans' Court. *See* Act of December 20, 1982, P.L. 1409, No. 326 § 316 (codified at 42 P.S. § 20076) (hereinafter JARACA 316). This repeal, however, did not affect the sheriff's office.

From this history it is apparent that the portion of section 27(a) which addresses sheriffs' powers and duties has not been repealed. Nothing in section 27(a) of the Judiciary Act contradicts any provision of JARA and therefore, JARA 2(a) does not affect section 27(a). JARA 10(27) is not inconsistent with section 27(a), but simply enumerates the sheriff's duty to serve process and execute court orders. JARA 10(27) does not purport to be an all-inclusive list of a sheriff's powers and duties and should not be interpreted as one. It is not inconsistent to statutorily define one common law duty of a sheriff while leaving others basically intact.[3]

---

**3.** There are two conflicting methods of interpreting our legislature's codification of one common law duty. First, utilizing the general rule of statutory construction that *expressio unius est exclusio alterius,* "that which is not included in the law shall be understood as excluded from the law," *Commonwealth v. DeFusco,* 378 Pa.Super. 442, 446, 549 A.2d 140, 141 (1988), it can be argued that JARA 10(27) prescribes all of the modern sheriff's powers. However, JARA 10(27) does not contain any language which supports reading it as an exclusive list. Moreover, such a reading would render section 27(a) meaningless.

Codifying one duty does not substantially diminish the sheriff's other common law duties. *See generally Soper v. Montgomery County*, 294 Md. 331, 337, 449 A.2d 1158, 1161 (1982). Moreover, the legislature, through JARACA 316, specifically repealed a particular portion of section 27(a) of the Judiciary Act. JARACA 316 is an unambiguous legislative statement which must take precedence over JARA 2(a), an earlier enacted general statutory section. *Compare* JARACA 316 and JARA 2(a); *cf.* 1 Pa.C.S. § 1933 (if a general provision of a statute and a special provision of the same or a different statute conflict, "the special provisions shall prevail and shall be construed as an exception to the general provision ...). Accordingly, the portion of section 27(a) which concerns sheriffs is still in effect.[4]

The conclusion that section 27(a) is still viable and that JARA 10(27) does not enumerate all of the sheriff's powers is also supported by the principle that neither JARA nor JARACA could constitutionally divest a sheriff of his common law duties. Where the sheriff is a constitutional officer, he is vested with the powers and duties possessed by sheriffs at common law. W. Anderson, *A Treatise on the Law of Sheriffs, Coroners and Constables with Forms*, Volume 1, § 43 at 37 (1941) (hereinafter Anderson, *Sheriffs*); W. Murfree, Sr., *A Treatise on the Law of Sheriffs and other Ministerial Officers*, § 41 at 22 (1884) (herein-

Ascribing no meaning to section 27(a) would contravene the *express* rule of statutory construction that statutes relating to the same "things," must, if possible, be read together, as one consistent statute. 1 Pa.C.S. § 1932. It is possible to read JARA 10(27) and section 27(a) together and assign each one meaning. When this method of construction is applied, it becomes apparent that the sheriff's statutorily defined powers are supplemented by his traditional common law powers and duties. I would adopt this latter interpretation because it is derived from principles enunciated in our Statutory Construction Act, 1 Pa.C.S. § 1501 *et seq.*, and, as elucidated on page 1043, *infra*, the legislature cannot limit the sheriff's common law powers by statute.

4. Although the majority relies heavily upon JARA 10(27)(42 Pa.C.S. § 2921) in building his argument that the legislature has stripped sheriffs of their authority to arrest, notably absent from Judge Wieand's opinion is any explanation of the legislature's intent with regard to section 27(a), nor any explication of the foundation upon which the legislature's power to alter the fundamental nature of a constitutionally created office could rest.

after Murfree, *Sheriffs* ); 70 Am.Jur.2d *Sheriffs, Police, and Constables* § 56 at 270 (1987) (hereinafter *Sheriffs and Police* ). "While the legislature may impose additional duties upon the sheriff, where he is recognized as a constitutional officer, it cannot restrict or reduce his powers as allowed by the Constitution, *or as they were recognized when the constitution was adopted."* Anderson, *Sheriffs,* § 43 at 37 (emphasis added); *Sheriffs and Police,* § 56 at 270; *Brownstown Township v. County of Wayne,* 68 Mich. App. 244, 248, 242 N.W.2d 538, 539 (1976) ("[t]he Legislature may vary the duties of a constitutional office, but it may not change the duties so as to destroy the power to perform the duties of the office").

The notion that a statute cannot limit the sheriff's common law powers and duties is reflected in the deferential language of section 27(a) of the Judiciary Act; subsequent amendments to that Act did not, and could not, alter that constitutionally required deference. Consequently, today, the sheriff possesses the power and the obligation to perform all the duties of a common law sheriff, except so far as those powers and duties may have been modified by our state constitution or enlarged by statute. Anderson, *Sheriffs,* § 43 at 37; *see also* Murfree, *Sheriffs,* § 41 at 22 ("[i]t is competent for the state legislature to impose upon [the sheriff] new duties growing out of public policy or convenience, but it cannot strip him of his time-honored and common-law functions, and devolve them upon the incumbents of other offices created by legislative authority"); 80 C.J.S. *Sheriffs and Constables,* § 35 at 203–204 (1953) (hereinafter *Sheriffs and Constables* ) (in addition to express constitutional and statutory grants of power, sheriffs also have "such implied authority as is necessary to carry out such express authority").

Since JARA 10(27) cannot be read as an exclusive list of the modern sheriff's powers and duties, the scope of those duties must be determined with reference to the powers of

the office when it was first created.[5]  This inquiry requires reference in turn to the common law of England under 1 Pa.C.S. § 1503(a), which states:

> [t]he common law and such of the Statutes of England as were in force in the Province of Pennsylvania on May 14, 1776 and which were properly adapted to the circumstances of the inhabitants of this Commonwealth shall be deemed to have been in force in this Commonwealth from and after February 10, 1777.

1 Pa.C.S. § 1503(a).

"The office of sheriff is one of the oldest offices known to the common law system of jurisprudence.  It is an office of great dignity and greater antiquity."  Anderson, *Sheriffs*, § 1 at 2.

> [Sir Edward] Coke ascribes to [the sheriff] a treble custody, to wit, of the life of justice, of the life of the law, and of the life of the republic; of the life of justice, to serve process and to return indifferent juries for the trial of men's lives, liberties, lands, and goods; of the life of the law, to make execution, which is the life of the law; and of the life of the republic, to keep peace, etc.

Gwynne, *Sheriff and Coroner* at 57–58.  In his role as peace keeper, the sheriff is "the principal conservator of the peace within his bailiwick."  *Commonwealth v. Vandyke*, 57 Pa. 34, 39 (1868); *see also* Anderson, *Sheriffs*, § 42 at 36–37 (the sheriff is "responsible as conservator of the peace and protector of society against vice and crime").

---

5. Our present constitution was adopted in 1968.  However, our constitutions have always provided for the sheriff's office.  *See, e.g.*, Pa. Const. § 31 (1776) (repealed) ("[s]heriffs and coroners shall be elected annually in each city and county …"); Pa. Const. art. VI, § 1 (1790) (repealed) ("[s]heriffs and coroners shall, at the times and places of election of representatives, be chosen by the citizens of each county …"); Pa. Const. art. VI, § 1 (1838) (repealed) ("[s]heriffs and coroners shall, at the times and places of election of representatives, be chosen by the citizens of each county"); Pa. Const. art. XIV, § 1 (1874) (repealed) ("[c]ounty officers shall consist of sheriffs …").  Because the office of the sheriff has been perpetuated in each of these charters without specification or limitation of its powers, it is fair to conclude that the modern sheriff retains those powers which were understood to be inherent in the office at the time it was codified in the 1776 constitution.

"In short, all legislation tending to secure the peace, order, safety, and comfort of the community, naturally falls within [the sheriff's] province." Murfree, *Sheriffs*, § 1172 at 640; *see also Elder v. Camp*, 193 Ga. 320, 323, 18 S.E.2d 622, 625 (1942) (citation omitted) ("sheriff has the right and duty to 'enforce the laws enacted for the protection of the lives, persons, property, health, and morals of the people ...' "); *State v. Reichman*, 135 Tenn. 653, 665, 188 S.W. 225, 228 (1916) ("it is the duty of the sheriff and his deputies to keep their eyes open for evidence of public offenses, and that it is a distinct neglect of duty for them to ignore common knowledge of law violations ...").[6]

Under the common law of England, the sheriff's powers and duties as keeper of the queen's peace required him to

apprehend, and commit to prison, all persons who break the peace, or attempt to break it; and may bind any one in a recognisance to keep the peace. He may, and is bound *ex officio* to pursue, and take all traitors, murderers, felons, and other misdoers, and commit them to gaol for safe custody.

H. Broom and E. Hadley, *Commentaries on the Laws of England*, Volume I at 410 (1869); *see also* E. Jenks, *Stephen's Commentaries on the Laws of England*, Volume I

---

**6.** The sheriff's duty to preserve the peace is heightened when he knows that a particular area is not adequately patrolled by local authorities. *See Sheriffs and Police*, § 47 at 262; *Sheriffs and Constables*, § 42(c) at 213; *see also Soper*, 294 Md. at 338, 449 A.2d at 1162 (in counties where a police force has not been established, the sheriff provides local law enforcement and executes all duties otherwise performed by policemen); *Brownstown Township*, 68 Mich.App. at 251, 242 N.W.2d at 541. In Clarion County, Pennsylvania, for example, one night a week during the summer months, the Clarion County Sheriff's Office provides a deputy sheriff to patrol townships and boroughs that have not established a police force. *See The Clarion News* (July 26, 1989). Even if a jurisdiction within the sheriff's county has established its own police force, the sheriff's powers and duties are not diminished. *See Soper*, 294 Md. at 337, 449 A.2d at 1161 ("[w]e shall note that ordinarily [the common law powers of a sheriff] are concurrent with the powers now ordinarily exercised by police officers"); *Wolfe v. Huff*, 232 Ga. 44, 45, 205 S.E.2d 254, 255 (1974) ("[e]ven when a county police force is established, the power and authority of the sheriff to enforce the law and preserve the peace is not legally diminished. Both should act cooperatively and in concert to achieve this desired purpose").

at 313–314 (18th ed. 1925). When apprehending criminals, the sheriff could arrest, without a warrant, a person who committed a breach of the peace in his presence or any felon. *See id.* Volume IV at 275; *see also* Anderson, *Sheriffs,* § 166 at 160. When the sheriff's office was transplanted from England to the colonies, including Pennsylvania, its common law role as the primary peace officer of his bailiwick was not substantially altered.[7]

In Pennsylvania,

[t]he general rule is, 'A peace officer may, without a warrant, arrest for a felony or a misdemeanor committed in his presence although the right to arrest for a misdemeanor, unless conferred by statute, is restricted to misdemeanors amounting to a breach of the peace.'

*Commonwealth v. Pincavitch,* 206 Pa.Super. 539, 544, 214 A.2d 280, 282 (1965) (citation omitted). It is apparent from the discussion above that the common law powers of the sheriff included those of a peace officer. As these common law powers have been retained by the sheriff under the Pennsylvania constitution, it follows that the modern sheriff, in accordance with the general rule stated in *Pincavitch,* retains the common law authority to arrest for breaches of the peace committed in his presence.[8]

This court has stated:

**7.** In the United States, the English common law was altered only to allow the sheriff to arrest for *all* offenses attempted or committed in his presence, *without a warrant.* Murfree, *Sheriffs,* § 169 at 163; Anderson, *Sheriffs,* § 1161 at 629; *see also Reichman,* 135 Tenn. at 664, 188 S.W. at 228; *cf. United States v. Watson,* 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976) ("the ancient common-law rule [was] that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable grounds for making the arrest").

**8.** The Pennsylvania Crimes Code, which defines the term "peace officer," was not enacted until 1973. *See* 18 Pa.C.S. § 501. Therefore, the Code's definition is not controlling in determining whether the sheriff was a peace officer *at common law,* and whether the sheriff falls within the purview of the the *Pincavitch* court's description of the powers of a "peace officer."

However, I believe that the sheriff is a "peace officer" as defined by the Crimes Code. A "peace officer" is "[a]ny person who *by virtue of*

[since] 'all crimes are offenses against the peace, the phrase 'breach of the peace' would seem to extend to all indictable offenses, as well those which are in fact attended with force and violence, as those are only constructive breaches of the peace of the government, inasmuch as they violate its good order.'

*Commonwealth v. Magaro*, 175 Pa.Super. 79, 82, 103 A.2d 449, 451 (1954), *quoting Williamson v. United States*, 207 U.S. 425, 444, 28 S.Ct. 163, 169, 52 L.Ed. 278 (1908). It appears then, that any criminal offense constitutes a breach of the peace.

Because the sheriff had, at common law, the authority to make a warrantless arrest for any breach of the peace that was committed in his presence, an authority which was given constitutional dimension when the office of sheriff was incorporated in each of Pennsylvania's constitutions, it necessarily follows that the office retains identical arrest powers today. Additionally, there is no doubt that any criminal violation constitutes a breach of the peace. Consequently, the modern sheriff is authorized to stop and arrest, without a warrant, someone who violates the Motor Vehicle Code in his presence. *See* Anderson, *Sheriffs*, § 153 at 149; *see also* 69 Op.Ga.Att'y Gen. 385 (1969) ("[t]he enforcement of the criminal law, which include[s] traffic regulations, is logically comprehended by the phrase 'preserving the peace' ").[9]

*his office* or public employment is vested by law with the duty to maintain public order or to make arrests for offenses whether that duty extends to all offenses or is limited to specific offenses...." 18 Pa.C.S. § 501 (emphasis added). As I have discussed, the office of the sheriff has always been charged with the duty to maintain public order.

9. Our Motor Vehicle Code allows uniformed Pennsylvania State Police Officers to make warrantless arrests for violations occurring in their presence. 75 Pa.C.S. § 6304(a). Further, other uniformed police officers may arrest, without a warrant, nonresidents found committing code violations. 75 Pa.C.S. § 6304(b). These sections do not preclude the sheriff from performing a warrantless arrest.

As previously noted, a statute cannot extinguish the common law powers and duties of a constitutional officer. *See supra* at p. 496–497. Moreover, "[t]he powers of arrest conferred by [section 6304] are in

It is true, as Leet contends, that the sheriff's arrest powers date from a period when crimes were defined by the common law and that these common law crimes have since been abolished in Pennsylvania, 18 Pa.C.S. § 107(b), and replaced by the Crimes Code. However, it is a *non sequitur* to argue that because no common law crimes exist, there are no crimes for which the sheriff may arrest. A distinction must be drawn between the ability to arrest for common law crimes and deriving one's authority to arrest

addition to any other powers of arrest conferred by law." 75 Pa.C.S. § 6304(c). This clearly evidences the legislature's intent that section 6304 is *not,* as the majority states, an exclusive list of those officers authorized to make warrantless arrests. Because, as outlined above, the common law and our constitution confer upon the sheriff the power to arrest for any violation of a criminal statute occurring in his presence, 75 Pa.C.S. § 6304(a) and (b) should not be construed to limit the power to make warrantless arrests to state and local policemen.

In *Commonwealth v. Galloway,* 525 Pa. 12, 574 A.2d 1045 (1990), the Commonwealth argued that an investigator for the Attorney General's Office possessed the power to stop and arrest a motorist violating the Motor Vehicle Code. Our supreme court disagreed. The Commonwealth Attorney's Act, 71 P.S. § 732–101 *et seq.,* grants members of the Attorney General's Office the power to arrest *but restricts that power to arrests made in connection with the investigation and prosecution of offenses enumerated in 71 P.S. § 732–205.* 525 Pa. at 18, 574 A.2d at 1048. The court acknowledged that if enforcement of the Motor Vehicle Code was listed as a duty in section 732–205, by virtue of 75 Pa.C.S. § 6304(c), the investigator would possess the power to arrest for violations of that Code. However, section 732–205 does not mention enforcement of the Motor Vehicle Code. Hence, the power to stop for a Motor Vehicle Code violation was not otherwise "conferred by law" as required by 75 Pa.C.S. § 6304(c) and accordingly, the investigator had no authority to arrest for Motor Vehicle Code violations. *See Galloway,* 525 Pa. at 14–15, 574 A.2d at 1046.

*Galloway*'s holding that members of the Attorney General's Office cannot stop motorists for Motor Vehicle Code violations does not affect the conclusion that the sheriff does possess such power. *Galloway* is easily distinguished because it is based wholly on the supreme court's interpretation of the scope of power conferred on the Attorney General by the Commonwealth Attorney's Act. This Act does not purport to regulate the powers and duties of a sheriff and therefore the Act, and the *Galloway* decision, are not dispositive of the issue before this court. However, the *Galloway* court expressly recognized that arrest powers can arise from sources other than section 6304. 525 Pa. at 18–19 n. 2, 574 A.2d at 1048 n. 2. Thus, our statutes do not preclude this court from looking to the common law as the origin of the sheriff's arrest powers.

from the common law. The common law imparted to sheriffs the power to arrest for *all crimes committed in their presence.* While common law crimes have been expressly abrogated, the constitutional powers of the sheriff have not been altered. Because the legislature could not, by redefining crimes, accomplish indirectly what it could not do directly, *i.e.,* truncate the constitutionally endowed powers of the sheriff, it follows that the sheriff retains the authority to arrest without a warrant for all crimes, however defined, committed in his presence.

In my opinion, since Deputy Sheriff Gibbons had the authority to stop Leet for the Motor Vehicle Code violation committed in his presence, it is clear that suppression of the evidence based on the illegality of the stop was improper. However, because this court may affirm the trial court's order, if correct, on any basis, *Soloski v. Hetrick,* 396 Pa.Super. 140, 154 n. 8, 578 A.2d 445, 453 n. 8 (1990), further review of the suppression court's ruling is warranted here. Should the evidence have been suppressed as the result of an illegal search of Leet's car? A careful review of the record and applicable case law can only lead to the conclusion that the methamphetamine found in the tape deck of Leet's car was procured during a valid consensual search of Leet's car and that the evidence seized should have been admitted.

After moving Leet's car to a safe parking space, Deputy Sheriff Gibbons asked Leet if he would mind opening the paper bags that were in Leet's car. Following each request, Leet voluntarily opened a bag, eventually opening a bag containing marijuana. The voluntariness of Leet's consent must be determined by the totality of the circumstances. *Commonwealth v. Elliott,* 376 Pa.Super. 536, 553, 546 A.2d 654, 663 (1988). Further, the record must disclose that consent was not obtained through the use of duress or coercion. *Commonwealth v. Smagala,* 383 Pa.Super. 466, 474, 557 A.2d 347, 350 (1989). None of the testimony from the suppression hearing even remotely suggests the exist-

ence of threats, duress, or coercion. Hence, the marijuana was lawfully obtained.

After discovering the marijuana and arresting Leet, the officers began to search Leet's car.

> To justify ... a [warrantless] search ... [of an automobile,] an officer must have independent probable cause to believe that a felony has been committed by the occupants of the vehicle, or that it has been used in the furtherance of the commission of a felony, or *the officer must have a basis for believing that evidence of a crime is concealed within the vehicle,* or that there are weapons contained therein which are accessible to the occupants.

*Commonwealth v. Lewis,* 442 Pa. 98, 101, 275 A.2d 51, 52 (1971) (emphasis added); *Commonwealth v. Rodriguez,* 379 Pa.Super. 24, 28–29, 549 A.2d 578, 580 (1988) *allocatur granted,* 523 Pa. 649, 567 A.2d 652 (1989); *see also Commonwealth v. Milyak,* 508 Pa. 2, 8, 493 A.2d 1346, 1349 (1985) ("where there exists probable cause related to the vehicle or its occupants, a search of the vehicle is permissible"); *Commonwealth v. York,* 381 Pa.Super. 55, 63, 552 A.2d 1092, 1096 (1989) ("[w]here police officers have probable cause to believe a vehicle is carrying contraband, they may conduct a search of the vehicle as thorough as a district justice could authorize in a warrant"). Probable cause to believe that an automobile contains the fruits or instrumentalities of crime exists when the facts available to the officer would warrant such a belief in a man of reasonable caution. *Rodriguez,* 379 Pa.Super. at 28, 549 A.2d at 580. Here, the smell of marijuana and beer emanating from Leet's car and the subsequent lawful discovery of both substances inside the car gave rise to probable cause to believe that the car contained additional contraband. *Commonwealth v. Duell,* 305 Pa.Super. 431, 433, 451 A.2d 724, 725 (1982) ("probable cause to believe that the car might contain further contraband in the form of marijuana or alcohol" arose after police, during a roadside traffic stop, observed an open bottle of wine in the car and smelled marijuana); *see also Commonwealth v. Bailey,* 376 Pa.Su-

per. 291, 545 A.2d 942 (1988) (warrantless search of entire car was valid even though the defendant had already been arrested and handcuffed, where probable cause to believe that evidence of a crime was concealed in the automobile arose after a policeman observed the defendant holding a clear plastic bag which contained a white powder during the course of a roadside traffic stop); *Commonwealth v. Stoner*, 236 Pa.Super. 161, 165, 344 A.2d 633, 635 (1975) (probable cause to search automobile arose where, during a routine traffic stop, officer "observed marijuana seeds and leaves in plain view on the floor, seats, and clothing in" defendant's car); *Commonwealth v. Wright*, 234 Pa.Super. 83, 86, 339 A.2d 103, 105 (1975) (where officer observed heroin in defendant's car during a roadside stop, the officer had the "right to search the entire vehicle").

Thus, it was during the course of a valid search that Leet yelled to the officers that more drugs were hidden in the tape deck, leading to the discovery of the methamphetamine. The only conceivable motivation for Leet's behavior was his belief that the drugs would inevitably be discovered in the course of the search. I would not characterize a legal search based on probable cause to be a source of duress or coercion or to constitute a threat that would vitiate the voluntariness of Leet's behavior. Accordingly, it is clear that Leet voluntarily instructed the officers of the location of the methamphetamine. *Smagala, supra.* Consequently, I would find that the methamphetamine, the drug on which the charges against Leet were based, is admissible at trial.

The foregoing discussion may be summarized as follows: first, that Deputy Sheriff Gibbons possessed the authority to stop Leet for a traffic violation committed in his presence; and second, since Leet voluntarily disclosed during the course of a valid automobile search information leading to the discovery of methamphetamine, the drugs should not have been suppressed. For these reasons, I would reverse the suppression order and remand the case for trial.

FORD ELLIOTT, J., joins.